IN THE UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In Re:

WILLIAM K. PRZYBYSZ,

       Debtor.

Case No. DG 10-07110

Chapter 7

Hon. Scott W. Dales

_____/

JEFF A. MOYER, Chapter 7 Trustee,
of the Estate of William K. Przybysz,

       Plaintiff,

v.

KIRK AGERSON, an individual,

       Defendant.

Adversary Proc. No. 12-80217-swd

_____/

## SECOND AMENDED COMPLAINT

Jeff A. Moyer, the Chapter 7 Trustee of the bankruptcy estate of William K. Przybysz, by his counsel, Dawda, Mann, Mulcahy & Sadler, PLC, for his Second Amended Complaint states as follows:

### JURISDICTION AND VENUE

1.    This adversary proceeding is commenced before the same Court before which the underlying bankruptcy matter *In re William K. Przybysz* (DG 10-07110) was filed and is pending.

2.    This Court has jurisdiction over this adversary proceeding under 28 U.S.C.§ 1334(b).

3. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O), in which the Court is authorized and empowered to enter appropriate Orders and Judgments subject to review under 28 U.S.C. § 158.

4. Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5. Jeff A. Moyer is the Chapter 7 Trustee ("Trustee") appointed to administer the bankruptcy estate (the "Estate") and, by power of his appointment, and under 11 U.S.C. §§ 323 and 704(a)(1), has authority over the assets of Debtor, including authority to file this adversary claim.

6. Defendant Kirk Agerson ("Defendant") is a citizen and resident of the State of Michigan.

7. The Trustee brings this adversary proceeding, pursuant to Rule 7001 *et seq*. of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 544, 548, 550, 551 and MCL 566.31 *et seq*.

8. The Trustee has standing pursuant to 11 U.S.C. § 544(b)(1) because as of the petition date there existed at least one unsecured creditor with an allowable claim under 11 U.S.C. § 502 had standing to avoid the fraudulent Transfer identified herein.

## INTRODUCTION AND FACTUAL BACKGROUND

9. On June 3, 2010, William K. Przybysz ("Debtor") filed his petition for relief under chapter 7 of the bankruptcy code (the "Petition Date").

10. This adversary proceeding arises out of a Ponzi scheme masterminded by the Debtor.

11. Between 2006 and 2010, Debtor engaged in a series of investment transactions under the guise of fundraising for a "charitable" organization.

12. During this time Debtor used various of business entities as instrumentalities to conduct his fraudulent scheme, including WKP Enterprises, LLC, Miracle Match Sports & Entertainment, LLC and BP Sports & Entertainment (collectively the "Entities").

**Miracle Match Foundation**

13. Upon information and belief, Miracle Match Foundation ("MMF") was incorporated as a IRS 501(c)(3) charitable organization in 1997.

14. Upon information and belief, in or around 2005 MMF, subsequently lost its status at a charitable organization, yet still operates as under the guise of a charitable organization.

15. Upon information and belief, MMF has not filed tax returns since 2004.

16. MMF does not maintain corporate books, records or financial statements.

17. Debtor has utilized MMF's bank accounts for his personal purposes and has commingled its accounts with his own throughout its existence.

18. Other than the Transfer described herein, MMF has not owned any real or personal property, nor possessed any assets, at any time during its existence.

**Miracle Match Sports & Entertainment, LLC**

19. Upon information and belief, Miracle Match Sports & Entertainment, LLC ("MMSE") was incorporated as a for profit organization in 2001.

20. Upon information and belief, BPS has failed to file tax returns since its inception.

21. MMSE does not maintain corporate books, records or financial statements.

22. MMSE is active but has been not in good standing with the State of Michigan since 2008.

23. Other than the Transfer described herein, MMSE has not owned any real or personal property, nor possessed any assets, at any time during its existence.

24. MMSE has been active but not in good standing with the State of Michigan since 2008.

## WKP Enterprises

25. Upon information and belief, WKP Enterprises, LLC ("WKPE") was incorporated as a for profit organization in 2006.

26. Upon information and belief, the sole purpose of WKPE was to facilitate the Debtor's fraudulent scheme.

27. Since its incorporation, WKPE been nothing more than a façade of a legitimate operation.

28. WKPE purpose was to give the Debtor's investors, vendors and others the appearance of legitimacy when investing or making deals with the Debtor.

29. Upon information and belief, WKPE has failed to file tax returns since its inception.

30. WKPE does not maintain corporate books, records or financial statements.

31. Debtor has utilized WKPE's bank accounts for his personal purposes and has commingled its accounts with his own throughout its existence.

32. Other than the transfers described herein, WKPE has not owned any real or personal property, nor possessed any assets, at any time during its existence.

33. WKPE has not filed annual reports with the State of Michigan since 2007.

34. WKPE is active but has been not in good standing with the State of Michigan since 2010.

**BP Sports & Entertainment**

35. Upon information and belief, BP Sports & Entertainment, LLC ("BPS") was incorporated as a for profit organization in 2009.

36. Upon information and belief, BPS has failed to file tax returns since its inception.

37. BPS does not maintain corporate books, records or financial statements.

38. Debtor has utilized BPS' bank accounts for his personal purposes and has commingled its accounts with his own throughout its existence.

39. Other than the transfers described herein, BPS has not owned any real or personal property, nor possessed any assets, at any time during its existence.

40. Debtor is and/or was the principal, sole shareholder and sole employee of the Entities, which were no more than shells seeking to give the appearance of a legitimate business purpose.

41. The Entities are wholly controlled and influenced by the Debtor, such that a unity of interest exists making the Debtor and the Entities inseparable from one another.

42. Debtor disregarded corporate formalities with respect to the Entities such that there was no distinction between the Debtor and the Entities during the perpetration of his fraudulent scheme.

43. The Debtor used the Entities as instrumentalities to conduct and further his fraudulent scheme.

44. To adhere to the fiction that the Entities and Debtor are separate would be to sanction the acceptance of the fraud alleged herein, thereby promoting injustice.

**The Ponzi Scheme**

45.     The platform for Debtor's fraudulent scheme was a series of alleged charity tennis tournaments around the country at which the Debtor and tennis celebrities would play (for an appearance fee) each other to raise money for leukemia research. During the relevant time period for purposes of these proceedings, the Debtor's scheme was never a legitimate enterprise.

46.     Debtor convinced investors to advance (1) funds to him directly, (2) directly to one or more of the Entities, and/or (3) upon information and belief, directly to third-parties unrelated to the Debtor.

47.     Debtor convinced investors that these funds would be used as working capital to support the operations of charity tennis tournaments.

48.     These alleged investments were in actuality a part of a thinly disguised fraudulent scheme whereby Debtor received investments, varying in amount, with the promise of high yielding, fast returns on those investments.

49.     To perpetuate this fraudulent scheme, Debtor solicited investments from investors with knowledge of the fraudulent scheme or knowledge that they stood to receive exorbitant returns on their investments in a relatively short time.

50.     Throughout the scheme, Debtor encouraged investors to solicit other investors by spreading the word of investment opportunities with high yielding fast returns to family and friends in order to increase the investment pool.

51.     During the course of this scheme, Debtor solicited many investors willing to risk their personal funds for promised rapid, high returns.

52. To convince investors to invest in his scheme the Debtor, amongst other things, provided the investors with budgets for upcoming tennis tournaments, which provided the only support the investors needed to make their investments.

53. Upon information and belief, investors in the scheme did not review or request financial documents from Debtor to support their investments and guaranteed returns. Instead, they invested blindly, motivated by the prospect of exorbitant returns with rapid a turnaround.

54. As the scheme progressed, Debtor would use funds obtained from new investors to repay principal and/or interest to past investors to whom he promised high returns.

55. Debtor promised to repay the investments through high ticket sales, galas and auctions, which would all be spurred by the appearances of tennis legends.

56. With the exception of the tennis legends, who appeared for up-front fees, none of Debtor's promises were true.

57. For example, the only funds ever raised and turned over to support the charitable fight against leukemia were cash funds solicited from patrons/fans at the tennis events; not from the tennis tournaments themselves.

58. In fact, the tournaments never turned the profits promised by the budgets used to lure investors. The tournaments never turned any profits and in fact lost hundreds of thousands of dollars each.

59. While the tournaments made no profit for charities, the investors' funds were put to use primarily by repaying older investors and also by paying some of the tennis pros' appearance fees.

60. Despite the losses, Debtor continued to provide budgets for upcoming tournaments that demonstrated the expectation that great profits would be earned.

61. Debtor would promote the next tournaments (fully aware that repayment of investments would not be made from tournament proceeds) to new investors, in order to gather more funds to take his personal cut and to pay older investors and the tennis pros (their up-front fee).

62. Debtor used his personal accounts and the Entities' accounts interchangeably, showing no distinction or discretion with respect to separation of personal and business use.

63. Debtor not only used the investors' money (across accounts) to repay older investors, but in fact used the investment pool as his personal slush fund for years, including to pay medical bills, for personal travel, making large cash withdrawals and for other personal expenses.

64. Debtor carried out the cycle of soliciting new funds before older funds were depleted, in order to repay investors and continue the scheme.

65. Through all of these actions, Debtor took advantage of the greed of the investors, who sought steep and rapid returns on the money they invested.

66. As the scheme progressed, the Debtor continued to solicit funds from investors and deposit them into his personal accounts or into the Entities' accounts.

67. Debtor and the Entities continued to make payments to older investors, from Debtor's personal accounts and the Entities' accounts, using the funds solicited from the newer investors.

68. Defendant was amongst those investors who helped Debtor carry out this scheme for years and was a beneficiary of Debtor's scheme.

69. The records relied upon by the Trustee at the time of this Complaint demonstrate that Defendant received a transfer totaling Nine Thousand and 00/100 Dollars ($9,000.00) on April 11, 2008 from WKPE (the "Transfer").

70. Based on Debtor's fraudulent scheme and use of the Entities as a conduit to his scheme, which true purpose was the facilitation of the fraud, any of the Transfer made to or from the Entities are in fact Transfer made to or from the Debtor.

71. The records obtained by the Trustee fail to demonstrate that Defendant invested any money directly with Debtor or any of the Entities.

72. The majority of the money invested over the course the scheme went to repay earlier investors' their promised principal and/or interest, to entice investors to roll-over their investments and to keep new investments coming in, keeping the scheme alive.

73. This cycle continued until the time came that Debtor could no longer sustain his scheme.

74. Ponzi schemes such as the one operated by the Debtor are, as a matter of law and by definition, insolvent from their inception and become exponentially more insolvent as they continue to operate.

## COUNT I
## Avoidance of Fraudulent Transfer - Michigan Uniform Fraudulent Transfer Act, § 566.34(1)(a) and (1)(b) and 11 U.S.C. § 544(b)

75. The Trustee incorporates by reference the allegations contained in the previous paragraphs as though fully restated herein.

76. As of the petition date there existed at least one unsecured creditor with an allowable claim under 11 U.S.C. § 502 had standing to avoid the fraudulent Transfer identified herein.

77. MCL § 566.39 provides that the Trustee may avoid such fraudulent Transfer if the action is brought with six (6) years.

78. Within six (6) years of the Petition Date, Debtor made Transfer of his interest in property to or for the benefit of Defendant in the amount of Nine Thousand and 00/100 Dollars ($9,000.00).

79. The Transfer constituted the conveyance of an interest of the Debtor's in property within the meaning of MCL 566.31(l).

80. The Defendant did not give reasonably equivalent value to the Debtor in exchange for such Transfer, as the records demonstrates zero dollars coming in from Defendant to Debtor or the Entities.

81. Debtor made the Transfer for the purpose of delaying the inevitable collapse of the scheme in hopes to hold Defendant at bay while more funds could be solicited thereby enabling the scheme to continue.

82. Each of the Transfer was made with the actual intent to hinder, delay or defraud Debtor's then existing and/or future creditors.

83. The Defendant took the Transfer with knowledge that the Debtor's promised returns were exorbitant and highly usual for a short term investment, and thus did not take the Transfer in good faith.

84. Debtor had no assets, no source of income or any property (real or personal) during the scheme, yet carried the obligation of repaying the Ponzi investors their guaranteed returns.

85. At no point in time during the scheme could Debtor pay the guaranteed investment obligations as they became due.

86. Debtor was by all accounts insolvent at the time of the Transfer.

87. The Ponzi scheme was self-sustaining but could last only as long as investors invested.

88. Debtor required new investments to repay older investments, such that at the time of the Transfer, Debtor knew the Transfer would cause him to incur debts beyond his ability to repay at any given time during the relevant period.

89. The Transfer constitute fraudulent Transfer avoidable by the Trustee pursuant to MCL § 566.34(1)(a) and (1)(b).

WHEREFORE, the Trustee prays that this Honorable Court enter Judgment against Defendant: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendant for the benefit of Debtor's estate.

## COUNT II
### Avoidance and Preservation of Fraudulent Transfer
### Michigan Uniform Fraudulent Transfer Act, § 566.35(1) and 11 U.S.C. § 544(b)

90. The Trustee incorporates by reference the allegations contained in the previous paragraphs as though fully restated herein.

91. As of the petition date there existed at least one unsecured creditor with an allowable claim under 11 U.S.C. § 502 had standing to avoid the fraudulent Transfer identified herein.

92. As of the Petition Date creditor Sandy Webster had an undisputed claim, allowable under 11 U.S.C. § 502.

93. Sandy Webster's claim against Debtor arose in or around September 2006, prior to the Transfer.

94. MCL § 566.39 provides that the Trustee may avoid such fraudulent Transfer if the action is brought with six (6) years.

95. Within six (6) years of the Petition Date, Debtor made Transfer of his interest in property to or for the benefit of Defendant in the amount of F Nine Thousand and 00/100 Dollars ($9,000.00).

96. The Transfer constituted the conveyance of an interest of the Debtor's in property within the meaning of MCL § 566.31(l).

97. The Defendant did not give reasonably equivalent value to the Debtor in exchange for the Transfer, as the records demonstrates zero dollars coming in from Defendant to Debtor or the Entities.

98. At no point in time during the scheme could Debtor pay the guaranteed investment obligations as they became due.

99. Debtor had no assets, no source of income or any property (real or personal) during the scheme, yet carried the obligation of repaying the Ponzi investors their guaranteed returns.

100. Debtor was by all accounts insolvent at the time of the Transfer.

101. By operation of the scheme, at the time Debtor made the Transfer, Debtor had incurred, intended to incur, and believed that he would incur debts that would be beyond his ability to repay as such debts matured.

102. At the time of the Transfer, Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which the property left constituted unreasonably small assets.

103. The Transfer constitute fraudulent Transfer avoidable by the Trustee pursuant to MCL § 566.35(1).

WHEREFORE, the Trustee prays that this Honorable Court enter Judgment against Defendant: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendant for the benefit of Debtor's estate.

## COUNT III
### Recovery Of Avoided Transfer Pursuant To 11 U.S.C. § 550

104. The Trustee incorporates by reference the allegations contained in the previous paragraphs as though fully restated herein.

105. To the extent any of the Transfer are avoided under Counts I through III, the Trustee is entitled to recover the value of the Transfer from the initial transferee pursuant to 11 U.S.C. § 550.

106. Defendant is the initial transferee of the Transfer.

WHEREFORE, the Trustee prays that this Honorable Court enter Judgment against Defendant, pursuant to 11 U.S.C. § 550 for the recovery of all Transfer avoided by this Court, together with interest, costs and such other and further relief this Court deems just, equitable and proper.

Respectfully submitted,

DAWDA, MANN, MULCAHY & SADLER, PLC

Dated: October 9, 2012 By: */s/ Earl R. Johnson*
Jessica B. Allmand (P59128)
Earl R. Johnson (P70359)
39533 Woodward Avenue, Suite 200
Bloomfield Hills, MI 48304-5103
(248) 642-3700 / (248) 642-7791 fax
jallmand@dmms.com
ejohnson@dmms.com
Attorneys for Chapter 7 Trustee

**CERTIFICATE OF SERVICE**
The undersigned certifies that the foregoing instrument was filed via ECF, which in turn served the foregoing upon all parties to the above cause on their counsel of record on October 9, 2012.

Signature: */s/ Debra D. Jaworski*
Debra D. Jaworski, Legal Secretary
Dawda, Mann, Mulcahy & Sadler, PLC
ddj@dmms.com

14